FORM 12. Informal Opening Brief (District Court, Court of International Trade, and Court of Federal Claims)

Form 12 (p. 1)
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### INFORMAL BRIEF OF APPELLANT

RECEIVED

DEC 2 0 2022

United States Court of Appeals
For The Federal Circuit

**Case Number:** 23-1257

**Short Case Caption:** Golden v. Intel

**Name of Appellant:** Larry Golden

---

**Instructions:** Read the Guide for Unrepresented Parties before completing this form. Answer the questions as best as you can. Attach additional pages as needed to answer the questions. This form and continuation pages may not exceed 30 pages.

Attach a copy of the trial court's opinion, order, and/or judgment. You may also attach other record material as an appendix. Any attached material should be referenced in answer to the below questions. Please redact (erase, cover, or otherwise make unreadable) social security numbers or comparable private personal identifiers that appear in any attachments you submit.

---

1. Have you ever had another case before this court?   ☑ Yes   ☐ No
   If yes, state the name and number of each case.

   > Golden v. Apple Inc.: Case No. 2023-1161 (pending)
   > Golden v. Google LLC: Case No. 2022-1267
   > Golden v. Apple, Inc. et al: Case No. 2022-1229
   > Golden v. US: Case No. 2022-1196

2. Did the trial court incorrectly decide or fail to take into account any facts?
   ☑ Yes   ☐ No
   If yes, what facts?

   > The Trial Court fail to consider the opinion of this Superior Court in Golden v. Google Case No. 2022-1267 where the Fed. Circuit acknowledges that the "smartphone" of Google [included with the 'species' of the communication devices i.e., laptops, desktop PCs, and tablets used by Intel] has written support in the patents and was issued with the presumption of validity

3.  Did the trial court apply the wrong law? ☑ Yes    ☐ No
If yes, what law should be applied?

> Instead of determining the sufficiency of Plaintiff's pleadings under 12(b)(6). The Trial Court decided to introduce an argument of "invalid patent claims". The Trial Court stated Plaintiff does not have "a patent in Central Processing Units (CPUs), laptops, or any of the technology used by Intel ... the patents themselves confirm that he does not..." The Trial Court applied 35 U.S. Code § 101 (patentability), and 35 U.S. Code § 112 (specification-written description) to Plaintiff's case to justify dismissing Plaintiff's case under 12(b)(6). Plaintiff understand the Court has decretion on the direction the Court preceedings should go, but in this case the Trial Court applied the wrong law. Worst than that the Trial Court failed to give Plaintiff the opportunity to answer before dismissing with prejudice. Further, this is Plaintiff's first complaint against Intel, if necessay, amendment is proper.

4.  Did the trial court fail to consider important grounds for relief?
☑ Yes    ☐ No
If yes, what grounds?

> Plaintiff provided Intel with a cease and desist request and notice of proposed settlement in year 2010. Intel made the decision to ignore Plaintiff's patents (willful infringement); Intel decided to "tie" their allegedly infringing CPUs to their chipsets and offered them for sell (Section 4 of the Clayton Act); Intel contributed to infringement of Plaintiff's patented communication devices (contributory infringement); Intel, without license or right to do so, "used" Plaintiff's communication devices to generate hundreds of billions in revenue (direct infringement); Intel allegedly entered agreements with OEMs to restrain Plaintiff from entering the market (Section 1 of the Sherman Act); and Intel massively sold Plaintiff's allegedly infringing CPUs to form and maintain its monopoly (Section 2 of the Sherman Act). Triple damages under the Clayton Act and triple damages for willful infringement.

5.  Are there other reasons why the trial court's decision was wrong?
☑ Yes    ☐ No
If yes, what reasons?

> The Trial Court relies on the decisions by other courts as persuasive authority to dismiss Plaintiff's case: Example, in Golden v. US: Plaintiff filed 1491 gov. takins of a patent as the cause of action (see cover page of docket), but the Court changed the cause of action to patent infringement; the DHS & DOJ filed a IPR petition at the PTAB, the DHS & DOJ are not persons authorized to do so; the Court stated Plaintiff has stated a claim for relief (72 claims of infringement), but two days after decided, without explanation, to give the Gov't another chance. In the District Court 1) dismissed a case as duplicative, Fed. Circuit did not affirm, the SCDC decided not to allow refiling a dismissed without prejudice case; 2) wrongfully dismissed a case for page count; 3) changed a antitrust cause of action to an infringement case ... Plaintiff could go on but believe enough is stated to clearly define why Plaintiff had to file multiple complaints. The most important thing here is in Golden v. Google, Plaintiff's complaint and claim charts were not found to be facially frivolous by the Federal Circuit.

6. What action do you want this court to take in this case?

Vacate and Remand this case back to the District Court with instructions. Plaintiff-Appellant's patented CPU has never before been adjudicated for patent infringement; Plaintiff-Appellant has never before brought a claim of alleged patent infringement against Intel; and, Plaintiff-Appellant should not be barred from amending (if needed) his first complaint against Intel. The only other case pending that parallels the alleged patent infringement; willful patent infringement (after being given notice); and, the illegal formation and maintenance of a monopoly (after being given notice); is Golden v. Qualcomm NDC Case No. 22-3283 (Golden v. Qualcomm NDC Case No. 22-3283 was filed before the Intel case and is still pending).

Date: 12/17/2022

Signature: *Larry Golden*

Name: Larry Golden

**The Trial Court's Clear Error of Judgement: Occurred When the Trial Court Raised Patent-Eligibility Under Section 101 and Dismissed the Complaint.**

The Trial Court raised patent-eligibility under Section 101 in its Opinion

"'Golden does not plausibly allege he has a patent in Central Processing Units

(CPUs), laptops, or any of the technology used by Intel'… [t]he patents themselves

confirm that he does not … the same patent claims at issue here are frivolous …

Golden has not stated a claim for direct or contributory patent infringement…"

> "35 U.S. Code § 101 - Inventions patentable: Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."

The question of "does the presumption of patent validity under 35 U.S.C.

§282 also include or require a presumption that claims are patent-eligible under

Section 101? This question was answered on June 25, 2019, in *Cellspin Soft v.*

*Fitbit*, 927 F.3d 1306, 1319 (Fed. Cir. 2019), the Federal Circuit addressed the

issue in a unanimous and precedential decision, clarifying that issued U.S. patents

should indeed be accorded a presumption of eligibility.

When it comes to Plaintiff's utility patents, the Trial Court can't just eyeball

it. The Trial Court must go to the claims and perform a detailed technical analysis.

A patent gives the Patent Owner (PO) the right to exclude others from using,

selling, manufacturing the invention. There's a certain hierarchy in utility patent

claims that requires training in order to understand the coverage [this task is best

4

performed by the patent examiners at the USPTO], and then compare the coverage

to an accused product [this task is best performed by skilled patent litigation

attorneys]. The resolution to both task is best decided in jury deliberation.

A patent claim defines the subject matter that is sought to be protected, and

the boundaries of an invention; lays down what the patent does/does not cover.

On October 1, 2015, the three-judge panel of Green, Tornquist, and Cherry

in the case of *United States Department of Homeland Security, v. Larry Golden,*

IPR Final Written Decision. Case No. IPR2014-00714 Trials@uspto.gov, decided

cell phones, smart phones, desktops, handhelds, PDAs, laptops, or computer

terminals are '*species*' of the claim(s) '*genus*' "communication devices".

> "[a]communication device of at least one of *a cell phone a smart phone a
> desktop, a handheld, a PDA, a laptop, or a computer terminal…*" "[P]atent
> Owner contends that this [] language is consistent with words found in the
> disclosure of the '118 application …" "[t]he specific devices [] such as the
> cell phones and smart phones would be recognized by one of ordinary skill
> in the art as a type of communication device or monitoring equipment
> because cell phones and smartphones are devices that are capable of
> communication and are capable of receiving signals"… "[a]s Patent Owner
> explains, the added language is [] intended to reflect the entire genus of
> "monitoring equipment" and "communications devices" … "the claim has
> been broadened to not only include the listed species that have been
> removed, but anything falling within the claimed genus."

Throughout this document Plaintiff methodically makes a comparison of the

patents and patent claims [claims 5, 23, & 1 of the '287, '439, & '189 patents]

asserted in *Larry Golden v. Google LLC*; CAFC Case No. 22-1267, Filed 09/08/22,

to the alleged infringing communication devices '***used***' by Intel; the alleged

infringing central processing units (CPUs) Intel '***contributes***' to the alleged

infringing communication devices; and, the alleged infringing central processing

units (CPUs) Intel '***ties***' to Intel's chipsets, or SoCs. In the *OPINION*:

> "Mr. Golden's complaint includes a detailed claim chart mapping features
> of an accused product, the Google Pixel 5 Smartphone, to independent
> claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 ... to
> map claim limitations to infringing product features, and it does so in a
> relatively straightforward manner ... Mr. Golden has made efforts to identify
> exactly how the accused products meet the limitations of his claims ..."

The following specifications show the preponderance of evidence presented

in this case by Plaintiff to support Plaintiff's claim that he holds the patent rights to

the new, improved upon, and useful, PCs, laptops, tablets, cell phones, smart-

phones and central processing units (CPUs) used by Intel to unjustly enrich itself.

## Patent Specifications Support for Plaintiff's CMDC devices

- Each [] can also be used as a manual, stand-alone hand-held scanner.

- Still another objective of the present invention is ... part of the system can
  be used as stand-alone scanners.
- FIG. 12 is a representative schematic view ... of the present invention
  illustrating the sequence of steps undertaken ... when functioning as a stand-
  alone scanner...
- FIG. 18 ... a monitoring site and a cell phone tower for communicating to
  and with an electronic device such as a laptop computer or a cell phone...
- ... detectors 46 can also be used as stand-alone scanners ... a sensor 52 for
  detecting the specific agent, element or compound ... visible when the
  detector 46 is used as a stand-alone scanner.
- The detector 46 functions as a stand-alone scanner and can be wirelessly
  interconnected ...
- In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5
  and 15, can be adapted and incorporated to include desktop PCs, notebook
  PCs, laptops, cell phones, LCD monitors, and satellite monitoring.

- The system 10 and the watchtower 112, along with the satellite 136 and the monitoring site 138 can be adapted or incorporated with cell phone towers … wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, or a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones …
- The cell phone detector case 150 and cell phone monitor 152 thus comprise a hand-held, easily portable and transportable
- FIGS. 18 and 19 illustrate representative examples of the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b …
- … the vehicle 192 that utilizes [] activation and/or distress signal 206 originates from the cell phone 187a or the laptop 187b … specific monitoring equipment 138 that can also include but is not limited to cell phones, laptops, desktop PC's, notebook PC's and LCD monitors.
- In FIG. 19 a signal has traveled to the satellites nearest the vehicle's 192 current location and then the signal 218 has traveled to the monitoring equipment 138 [] which can include but is not limited to satellite cell phones, [], cell phones, laptops, desktop PC's, notebook PC's …
- … the products grouped into what may be referred to as Product grouping 4 (monitoring & communication devices) include, [], mobile communication devices, … wired communication devices, wireless communication devices, [], desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite cell phones, cell phones… [] (PDAs), … [], handhelds…

## Claims 1-10 of Plaintiff's 10,984,619 ('619) Patent CMDC devices / CPU

1. A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of:

processing instructions to lock, unlock, or disable the lock of the communication device;

processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob;

processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;

processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle;

processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;

processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and,

whereupon, the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.

2.    The communication device of claim 1, comprising at least a central processing unit (CPU), capable of processing operational instructions for at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner.

3.    The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal to lock, unlock, or disable the lock of the communication device.

4.    The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of at least fingerprint recognition, facial recognition, iris recognition, or retina recognition.

5.    The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of at least short-range wireless radio frequency near-field communication (NFC).

6.    The communication device of claim 1, comprising at least a central

processing unit (CPU), capable of receiving a signal from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor.

7.    The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal from at least one of chemical, biological, radiological, nuclear, or explosives detection.

8.    The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal through at least a Bluetooth, a Wi-Fi, a satellite, a cellular, or GPS connection.

9.    The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of the communication device connection to the internet or internet-of-things (IoTs) platform to sync at least a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device.

10.    The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of the operational and functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory.

## Patent Specifications Support for Plaintiff's CPUs

- … includes a power source (battery or electrical), interior compartments, Internet and GPS connections and a *cpu* interconnected with the Internet and GPS connections, and also interconnected with one or more off site monitoring computer terminals or PCs …
- … includes a sound alarm, a sensor, a light alarm, and a readings panel, and is electrically interconnected (either by wire or wirelessly) to the *cpu* …the [] agent [] can be conveyed from the detectors to the detector case *cpu* …
- … a GPS satellite in conjunction with the monitoring site and monitoring equipment to relay commands and signals to the *cpu* …
- A *cpu* 40 is mounted within the detector case 12 and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates with a [] and monitoring equipment …
- … detectors 46 are interconnected to the *cpu* 40 of the detection system 10 by conventional connections that can be wire or wireless for

transmitting the appropriate signals to the ***cpu*** 40 … includes a conventional ***microprocessor*** for controlling the various functions and generating the appropriate signals for transmission to the ***cpu*** 40 …

- FIG. 3*a* shows the automatic/mechanical lock disabler 56 mounted—by any conventional means—to the lock 60 … shown in FIGS. 4 and 5 and connected by wire 58 to the ***cpu*** 40

- The fingerprint biometric lock with disabler 62 is interconnected to the ***cpu*** 40 … the fingerprint of the individual is placed on the fingerprint-matching pad 64, [] match occurs with [] fingerprint stored by the ***cpu*** 40 …

- … receipt of a signal from the ***cpu*** 40 for locking or disabling the locking mechanism thereby denying access …

- … describing the signal transmission process from the detector 46 to the ***cpu*** 40 … the specific agent will trigger the sound alarm 80 and the light alarm 82, and instant transmittal of a signal to the ***cpu*** 40 … [t]he readings 84 can be stored by the ***cpu*** 40 for verification and future …

- … detector 46 undergoes the same essential steps as illustrated in FIG. 11, with the exception of the signal transmission to the ***cpu*** 40 …

- … the system 10—the ***cpu*** 40—will transmit a lock/disable lock signal 94 to the automatic/mechanical lock disabler 56 to lock or disable the lock …

- … the various alarms would sound and light up [], and the ***cpu*** 40 would then transmit a signal to the fingerprint biometric lock with disabler 62 …

- The ***cpu*** 40 would transmit a lock/disable signal 120 to lock or disable the lock 60 thus preventing access …

- … the monitoring site 138 can be adapted or incorporated with cell phone towers and satellites for use with satellite communication and/or a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (***cpu***), such as ***cpu*** 40 …

- … color coded indicator lights 186 will be electrically interconnected to the sensor/detectors 176 via any standard ***microprocessor.***

- A ***CPU*** [] is programmed to receive signals from the cell phone tower 190 and/or to a GPS satellite 204 [] interconnected with [] stall-to-stop system …

- … that an original or activation signal has been received and then the GPS satellite 204 locates and communicates by multiplex signal 212 with the ***CPU*** or transceiver 202 on the vehicle … monitoring equipment 138 then transmits a signal 214 to the cell phone tower 190 that communicates with the transceiver 202 and/or ***CPU*** of the vehicle 192 to initiate [] commands

- … GPS satellite 204 then locates and communicates with the ***CPU*** and/or transceiver 202 on the vehicle … the GPS satellite 204 that in turn

communicates via another signal 224 with the *CPU* and/or transceiver 202 to execute any commands to the stall-to-stop system ...

### Claims 11-20 of Plaintiff's 10,984,619 ('619) Patent CPU / CMDC devices

11.    A *central processing unit (CPU)* of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of:
    processing instructions to lock, unlock, or disable the lock of the communication device;
    processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob;
    processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;
    processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle;
    processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;
    processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);
    processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;
    processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);
    processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;
    processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and,
    whereupon, the *central processing unit (CPU)* of the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.

12.    The central processing unit (*CPU*) of claim 11, capable of processing

operational instructions for at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner.

13.     The central processing unit (*CPU*) of claim 11, capable of processing operational instructions to lock, unlock, or disable the lock of the communication device.

14.     The central processing unit (*CPU*) of claim 11, capable of processing operational instructions of at least fingerprint recognition, facial recognition, iris recognition, or retina recognition.

15.     The central processing unit (*CPU*) of claim 11, capable of processing operational instructions from short-range wireless radio frequency near-field communication (NFC).

16.     The central processing unit (*CPU*) of claim 11, capable of processing operational instructions from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor.

17.     The central processing unit (*CPU*) of claim 11, capable of processing operational instructions from at least chemical, biological, radiological, nuclear, or explosives detection.

18.     The central processing unit (*CPU*) of claim 11, capable of processing operational instructions through at least a Bluetooth, a Wi-Fi, a satellite, a cellular, or GPS connection.

19.     The central processing unit (*CPU*) of claim 11, capable of processing operational instructions of the communication device connection to the internet or internet-of-things (IoTs) platform to sync at least a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device.

20.     The central processing unit (*CPU*) of claim 11, capable of processing operational instructions of functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory.

**Direct Infringement: According to the Fed. Cir. In *Golden v. Google* 22-1267; HP, Lenova, & Dell, which uses Intel's CPU's, also directly infringes Plaintiff's "communication" devices. There must be "direct infringement". \***

| Independent Claim 5 Patent #: 10,163,287 | HP 27-dp0188qe AiO PC | Lenovo IdeaPad 3 14″ Laptop | Dell Venue 8 Pro 5855 Tablet |
|---|---|---|---|
|  |  |  |  |
| A communication device… a cell phone, a smart phone, a desktop, a hand-held, a PDA, a laptop, or a computer … | Desktop PC | Laptop | Tablet (i.e., Hand-Held) |
| at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program … | CPU: Intel® Core™ i7-10510U (1.8 GHz base frequency, up to 4.9 GHz with Intel® Turbo Boost Technology, 8 MB L3 cache, 4 cores) Integrated: Intel® UHD Graphics | CPU: Intel Core i5-1035G1 Quad Core Processor. Display: 14.0″ FHD LED Backlit Anti-Glare Display Memory: 8GB (4GBOnBoard + 4GB DIMM) Operating system: Windows 10 | CPU: Intel Atom x5-Z8500 quad-core; GPU: Intel HD Graphics; 4 GB of working memory; Operating System: preloaded Window 10 |

\*   List of Intel's products taken from the charts above & below: Plaintiff's alleges infringes his patented CPU, and list of products Intel "*contributes*" to the infringement of Plaintiff's patents. Intel® Core™ i7-10510U CPU (HP 27-dp0188qe AiO PC); Intel Core i5-1035G1 Quad Core CPU (Lenovo IdeaPad 3 14" Laptop); Intel Atom x5-Z8500 quad-core CPU (Dell Venue 8 Pro 5855 Tablet); Intel Celeron N2940 CPU (HP Chromebook 14); Intel Core i7-4702MQ 4 core CPU (HP Envy 17 Leap Notebook); Intel® Core™ i5-8250U CPU (10.1" Rugged Tablet for Windows); Intel Core i7-1165G7 CPU (HP Envy 13); Intel Core i7-11370H CPU (Dell Vostro 15); Intel 11th Gen Core i5-1135G7 CPU (Lenovo IdeaPad 5); Intel Atom® x6000E CPU processor series and Intel® Pentium® and Intel® Celeron® N and J Series CPUs (Intel's Internet of Things (IoT) network of devices); Intel's Loihi Neuromorphic Chip to Learn and Recognize the Scents of 10 Hazardous Chemicals… the activity of 72 chemical sensors.

**Contributory Infringement: Intel "use" of Plaintiff's patented CMDC devices. Below, Intel's elements are identified in 34 (66.7%) of the 51 claim limitations of claim 5, 23, & 1 of the '287, '439, & '189 patents. Plaintiff's CPUs are referenced 15 times in the Patent claims. Every claim limitation is covered. \***

| CMDC Devices (i.e., laptops, desktops, tablets, etc.) that includes Intel CPUs | Patent #: 10,163,287; Independent Claim 5 | Patent #: 9,589,439; Independent Claim 23 | Patent #: 9,096,189; Independent Claim 1 |
|---|---|---|---|
|  ***Specifications of Patents***: "… can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, | A monitoring device, comprising: | A cell phone comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: |
| **Intel Core** is a line of computer central processing units (CPUs) marketed by Intel Corporation. The Core processors includes the Intel Core i3; Core i5; Core i7, and Core i9 the X-series of Intel CPUs.  Intel Core i7 as an Intel brand name applies to several families of desktop and laptop 64-bit x86-64 processors | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; |

| | | | |
|---|---|---|---|
| Modern laptops with Intel CPUs have lots of temperature sensors built-in. Typically found: 1 in CPU; 1 extra in each CPU core (so for a typical laptop, up to 4); 1-2 in motherboard chipset(s);1 in each (hard) drive. Some laptops include additional sensors: on the heat pipes, battery, some spot in the case, memory slots, and raid controllers | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | X | X |
| Laptops with motion control: HP Chromebook 14 [CPU: 1.83GHz Intel Celeron N2940 processor] and the HP Envy 17 Leap Motion SE TouchSmart notebook [Intel Core i7-4702MQ (2.2 GHz, 6 MB cache, 4 cores)]. The new sensor allows for 3D motion sensing, letting you gesture in the air above the sensor to interact with an array of apps and usability tools on the PC | at least one motion sensor in communication with the at least one CPU; | X | X |
| Today, all modern laptops and smart devices now come with infrared light detection sensors as standard allowing screens to illuminate when an object is nearby and go dark when it is not. Tablets with Ambient Light Sensor: AIM-65 8" Industrial Tablet with Intel CPU Processor [Intel Atom x5-Z8350 (4 core 1.44 GHz)] and Ambient Light Sensor | at least one viewing screen for monitoring in communication with the at least one CPU; | X | X |

| | | | |
|---|---|---|---|
| 10.1" Rugged Tablet for Windows with NFC, 4G, GPS, & WIFI: CPU: 8th Generation KBL-R Intel® Core™ i5-8250U, 4M Cache, 3.40 GHz; Optional CPU: Optional: 8th Generation KBL-R Intel® Core™ i7-8550U, max. frequency 4.0 GHz  | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; |
| 10.1" Rugged Tablet for Windows with NFC, 4G, GPS, & WIFI: CPU: 8th Generation KBL-R Intel® Core™ i5-8250U, 4M Cache, 3.40 GHz; Optional CPU: Optional: 8th Generation KBL-R Intel® Core™ i7-8550U, max. frequency 4.0 GHz  | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | wherein at least one of… WiFi connection, internet connection, radio frequency (RF) connection, cellular connection… capable of signal communication with the transmitter or the receiver; | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group… of satellite, Bluetooth, WiFi… |
| 10.1" Rugged Tablet for Windows with NFC, 4G, GPS, & WIFI: CPU: 8th Generation KBL-R Intel® Core™ i5-8250U, 4M Cache, 3.40 GHz; Optional CPU: Optional: 8th Generation KBL-R Intel® Core™ i7-8550U, max. frequency 4.0 GHz  | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a… Bluetooth connection, WiFi connection, internet connection… cellular connection… short range radio frequency (RF) connection, or GPS connection; | X |

| | | | |
|---|---|---|---|
| Intel's Internet of Things (IoT) is a network of devices that create, modify, delete, send, and receive data between each other on their own; use data; make decisions  Intel's architecture and implementation of an Internet Of things based mobile application for a door lock security system This implementation has two devices i.e., Mobile and the Door, both are connected to the internet. The sensors connected to the internet (IoT) to be monitored remotely from anywhere in the world. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | X |
| Power Management Settings for Intel® Wireless Adapters: You can use the power management options to enable a power-saving mode.  Power management lets you select a balance between power consumption (or battery life) and wireless adapter performance. Low-Power Saving and Medium Power Saving have the same effect on Intel® Wireless Adapters. The setting under Device Manager Power Management Tab Allow the computer to turn off this device to save power has no effect on Wi-Fi power management. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | X | X |

| | | | |
|---|---|---|---|
| <br><br>HP Envy 13: Integrated UHD Graphics; Intel Core i7-1165G7; 13.3-inch FHD; Touchscreen Display; Fingerprint Scanner<br><br><br><br>Dell Vostro 15 5000 5510; Intel Iris Xe Graphics; 11th Generation Intel Core i7-11370H; 15.6-inch FHD (1920 x 1080); Anti-glare Display; Fingerprint Scanner<br><br><br><br>Lenovo IdeaPad 5; Intel Iris Xe Graphics; 11th Gen Intel Core i5-1135G7; 15.6" FHD WVA 300nits Anti-glare, 10-point Multi-touch Display; Fingerprint Scanner | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use |

| | | | |
|---|---|---|---|
| Intel's Loihi Neuromorphic Chip to Learn and Recognize the Scents of 10 Hazardous Chemicals.<br><br>Power Management Settings for Intel® Wireless Adapters: Power management lets you select a balance between power consumption (or battery life) and wireless adapter performance. | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween… |
| Intel's Loihi Neuromorphic Chip to Learn and Recognize the Scents of 10 Hazardous Chemicals. Below: Intel Labs' Nabil Imam holds a Loihi neuromorphic chip in his Santa Clara, California, neuromorphic computing lab. (Walden Kirsch/Intel Corp)<br> | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |
| 10.1" Rugged Tablet for Windows with NFC, 4G, GPS, & WIFI: CPU: 8th Generation KBL-R Intel® Core™ i5-8250U, 4M Cache, 3.40 GHz; Optional CPU: Optional: 8th Generation KBL-R Intel® Core™ i7-8550U, max. frequency 4.0 GHz<br> | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… | X | X |

| | | | |
|---|---|---|---|
| Intel has developed a new line of processors enhanced for IoT:<br><br>Intel Atom® x6000E CPU processor series and Intel® Pentium® and Intel® Celeron® N and J Series CPU processors. The processors build on new levels of CPU performance with integrated IoT features, real-time performance, manageability, security, and functional safety." https://www.intel.com/ | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect at least one of a chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;<br><br>a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; |
| Intel's Internet of Things (IoT) is a network of devices that create, modify, delete, send, and receive data between each other on their own; use data; make decisions<br><br>Intel's architecture and implementation of an Internet Of things based mobile application for a door lock security system This implementation has two devices i.e., Mobile and the Door, both are connected to the internet. The sensors connected to the internet (IoT) to be monitored remotely from anywhere in the world. | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems |

| | | | |
|---|---|---|---|
| Intel's Internet of Things (IoT) is a network of devices that create, modify, delete, send, and receive data between each other on their own; use data; make decisions<br><br>10.1" Rugged Tablet for Windows with NFC, 4G, GPS, & WIFI: CPU: 8th Generation KBL-R Intel® Core™ i5-8250U, 4M Cache, 3.40 GHz; Optional CPU: 8th Generation KBL-R Intel® Core™ i7-8550U, max. frequency 4.0 GHz<br> | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection… short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; |
| Intel and Cornell trained Intel's Loihi neuromorphic chip to learn and recognize the scents of 10 hazardous chemicals … the activity of 72 chemical sensors in response to these smells and configured the circuit diagram of biological olfaction on Loihi. The chip quickly learned the neural representation of each of the smells and each odor, demonstrating a future for neuroscience and AI.<br><br>Intel's Loihi 2 neuromorphic chip | X | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | X |

**The Trial Court's Error in Judgement: Its Failure to Recognized Plaintiff's Unlawful "Tying" Claim [Antitrust Law Violation]**

The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the "brain", and the core piece of hardware in the Patent Owner's Communication, Monitoring Detecting, and Controlling (CMDC) devices (i.e., new, improved upon, and useful desktop PCs, laptops, tablets, cell phones, etc.)

The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential to processing and executing program instructions.

The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs).

To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate

properly. The CPUs are often described as the "brain" of computers, smartphones and tablets because of the central role they play in the functioning of the devices.

All of the different components that make up a computer's processor have to be condensed to fit in devices, such as a laptops and tablets, where they exist as a mobile application processor, Chipset, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices.

Plaintiff has alleged Intel is "tying" its central processing units (CPUs) that allegedly infringes Plaintiff's central processing units (CPUs) covered in his patents, to its chipsets, or systems-on-chips (SoCs).

A core, or CPU core, is the "brain" of a CPU. It receives instructions, and performs calculations, or operations, to satisfy those instructions. A CPU can have multiple cores. A CPU (processor) with two cores is called a dual-core processor; with four cores, a quad-core; six cores, hexa-core; eight cores, octa-core. https://www.computer hope.com/jargon/c/core.htm#:~:text

A CPU core is a CPU processor. In the old days, every processor had just one core that could focus on one task at a time. Today, CPUs have been two and 18 cores, each of which can work on a different task. A core can work on one task, while another core works a different task, so the more cores a CPU has, the more efficient it is. Many processors, especially those in laptops, have two cores, but

some laptop CPUs (known as mobile CPUs), such as Intel's 8th Generation

processors, have four. Below is an Intel chipset with multiple CPU cores "tied" to

the other systems on the Chip.[1]



<hr />

[1]   Most processors can use a process called simultaneous multithreading or, if it's
an Intel processor, Hyper-threading (the two terms mean the same thing) to split a
core into virtual cores, which are called threads.

For example, Intel CPUs with two cores use Hyper-threading to provide four
threads. Note: Intel also uses the term "Core" to brand some of its CPUs (ex: Intel
Core i7-7500U processor). Of course, Intel CPUs (and all CPUs) that do not have
the Core branding use cores as well. https://www.tomshardware.com/news/cpu-
core-definition,37658.html

According to the United States Department of Justice (DOJ): <u>Chapter 5.</u>
<u>Antitrust Issues in the Tying and Bundling of Intellectual Property Rights. III.</u>
<u>Tying and Bundling Involving Intellectual Property</u>:

Linking intellectual property with products or other intellectual property can take many forms, such as offering licenses that cover multiple patents or copyrighted materials or "tying" the sale of two patented goods or one unpatented and one patented good. Such linkages carry various labels, depending on whether the linked product embodies intellectual property, whether one price or separate prices are charged (*added: Discovery will reveal more on the pricing structure and potential harm to the public. Intel's collection of revenue [royalties] on a product they do not have a patent on or license for, not only harms Plaintiff, it also harms all those doing business in the relevant market, and the patent system as a whole*), and whether the linkage is accomplished contractually or technologically.

Classic "contractual" patent "tying" occurs when the tying product (*added: Intel's allegedly infringing central processing unit (CPU)*) is patented, and the tied product is an unpatented commodity used as an input for the tying product (*added: Intel's chipset or system-on-a-chip*), and the sale of the patented product is conditioned on the purchase of the unpatented product (*added: the sale of Intel's allegedly infringing central processing unit (CPU) is conditioned on the purchase of Intel's chipset or system-on-a-chip*).

A "technological tie" may be defined as one in which "the 'tying' (*Intel's chipset or system-on-a-chip) and 'tied' (Intel's allegedly infringing central processing units (CPUs))* products are bundled together physically or produced in such a way that they are compatible only with each other" (*added: Intel's illustrative diagram above features a CPU quad-core, that is physically tied to an Intel chipset or system-on-a-chip*) 1 Hoenkamp et al., IP and Antitrust § 21.5b2, at 21-104 to -05.

The government's tying claim against Microsoft involved both the contractual and technological bundling of the Internet Explorer web browser (the tied product) with its Windows operating system (the tying product) (*added: Plaintiff's tying claim against Intel involves both the contractual and technological bundling, and has alleged the same*) *Microsoft*, 253 F.3d ast 45; see Complaint paras. 18, 20, 103-23, *Microsoft*, 87 F. Supp. 2d 30 (D.D.C. 2000) (No. 98-1232).

Plaintiff's antitrust injury happened as a result of Intel's unlawful "tying" practices. Plaintiff has shown he continues to suffer from this "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *American Ad Mgmt.*, 190 F.3d at 1055 (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)).

Because Plaintiff holds the patent rights to a CPU for a new and improved PC, laptop, or tablet; Plaintiff and Intel participates in the same market.

**The Trial Court's Clear Error in Judgement: Its Failure to Recognized Plaintiff as the "person [] injured in his business or property by reason of anything forbidden in the antitrust laws" [Section 4 of the Clayton Act]**

Section 4 of the Clayton Act 1914 allows the recovery of damages by "any person injured in his business or property by reason of anything forbidden in the antitrust laws" (Section 4, Clayton Act). The Act entitles a successful private claimant to an award of triple damages and costs (Section 4, Clayton Act). "Antitrust laws" includes:

- The Sherman Act 1890, which prohibits conspiracies and monopolization.

- Sections of the Robinson-Patman Act 1936, which prohibits discriminatory pricing (amending sections 13, 13a, 13b and 21, Clayton Act).

- "Any person" includes: Individuals. Partnerships. Corporations

Plaintiff has stated a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1 by alleging an agreement between Intel and Qualcomm that violates Section 1 of the Sherman Act, 15 U.S.C. § 1. Cf. Cal. *Dental Ass'n v. FTC*, 526 U.S. 756, 762 n.3 (1999).

Plaintiff has stated a claim under Section 2 of the Sherman Act, 15 U.S.C. § 2 by alleging unilateral conduct that constitutes monopolization (provisions apply only to firms that already possess monopoly power or have a dangerous probability of achieving monopoly power) as a result of Intel's unlawful "***use***" of products covered in Plaintiff's patents.

## PLAINTIFF'S HAS STATED ENOUGH FACTUAL ALLEGATIONS THAT IF TAKEN AS TRUE, ENTITLES HIM TO RELIEF

Plaintiff's allegations align with the Federal Trade Commission's allegations brought against Intel and Qualcomm. Intel self-incriminate itself in Brief of *Amicus Curiae* Intel Corporation in *FTC v. Qualcomm*: Case No. 5:17-cv-00220-LHK

Intel and Qualcomm were both given "cease and desist" request and offer to license Plaintiff's intellectual property (i.e., central processing units CPUs and Plaintiff's CMDC devices i.e., new, improved upon, and useful desktop PCs, laptops, tablets, cell phones) in 2010. Plaintiff has alleged both Intel and Qualcomm have conspired in restraint of trade to keep Plaintiff out of the market; both have ignored Plaintiff's "notice" and willfully infringed Plaintiff's patents; both are "unjustly" collecting royalties from the sell of an allegedly infringing central processing unit (CPU) that is "tied" to its chipsets, or SoCs; both are allegedly liable for "using" Plaintiff's patented new, improved upon, and useful desktop PCs, laptops, tablets, cell phones to form and maintain an illegal monopoly; both have allegedly "contributed" to the infringement of Plaintiff's patented inventions; both have been found liable for anticompetitive practices that undermines competition—in the current case, the claims are enhanced tremendously there's injury to Plaintiff who hold the patents for the alleged infringing products of Intel and Qualcomm ; both have cause injuries to Plaintiff of the type the antitrust were designed to protect; and, both have "induced" the infringement of their customers by threatening to withhold the CPUs; and, both continued their anticompetitive practices after being notified in 2010 (See Below)

| Brief of *Amicus Curiae* Intel Corporation in FTC v. Qualcomm: Case No. 5:17-cv-00220-LHK | Charges of Anticompetitive Conduct Against Intel |
|---|---|
| The FTC can state a claim under Section 5 of the FTC Act, 15 U.S.C. § 53(b), by alleging unilateral conduct that constitutes monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, or an agreement that violates Section 1 of the Sherman Act, 15 U.S.C. § 1. Cf. Cal. *Dental Ass'n v. FTC*, 526 U.S. 756, 762 n.3 (1999). "The offense of monopolization has two elements: '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *United States v. Microsoft Corp.*, 253 F.3d 34, 50 (D.C. Cir. 2001) (en banc) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)). | **Nov. 4, 2009**: New York Attorney General Andrew Cuomo filed a federal antitrust lawsuit against Intel in the U.S. District Court in Delaware, alleging that company engaged in a "systematic campaign" of illegal conduct to protect a monopoly. **Dec. 16, 2009**: The FTC filed antitrust lawsuit against Intel, alleging that Intel has waged a "systematic campaign" to cut off rivals' access to the marketplace and prevent adoption of superior products produced by competitors. "Intel has engaged in a deliberate campaign to hamstring competitive threats to its monopoly," Richard Feinstein, director of the FTC's Bureau of Competition, said in a statement. https://www.networkworld.com/article/2239461/intel-and-antitrust--a-brief-history.html |
| Qualcomm's behavior has inflicted and continues to inflict precisely the harms that the antitrust laws seek to protect against: harm to the competitive process, to consumer welfare, and to innovation and progress. This dominance arises not from Qualcomm's inherent superiority, but rather from its anticompetitive practices. As the FTC alleged, the[se] practice[s] take a number of form[s]: • An unprecedented "no-license-no-chips" policy, whereby Qualcomm refuses to sell OEMs any chipsets unless those manufacturers also purchase separate patent licenses that require them to pay exorbitant royalties for every handset they sell, regardless of whether the handset contains a Qualcomm chipset. | The FTC sued Intel in December 2009 alleging that the company used anticompetitive tactics to cut off rivals' access to the marketplace; deprive consumers of choice and innovation in the microchips that comprise computers' central processing unit, or CPU. These chips are critical components that often are referred to as the "brains" of a computer. The action also challenged Intel's conduct in markets for graphics processing units and other chips. Under the settlement, Intel will be prohibited from: 1) condition benefits to computer makers in exchange for their promise to buy chips from Intel exclusively or to refuse to buy chips from others; and 2) retaliating against computer makers if they do business with non-Intel suppliers by withholding benefits from them. |

"The offense of monopolization has two elements: '(1) the possession of monopoly power in the relevant market and (2) the *willful* acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *United States v. Microsoft Corp.*, 253 F.3d 34, 50 (D.C. Cir. 2001) (en banc) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).

Intel was knowledgeable of Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices, and CPUs dating back to 12/2010:

On 12/16/2010: Plaintiff's notice letters and licensing offer was mailed U.S. Postal Service, Certified Mail to Mr. Paul S. Otellini, President & CEO Intel, and Mr. Curt J. Nichols, VP Intel Capital Intel, at Mission College Blvd., Santa Clara, CA 95054-1549. Intel received and signed for the letters 12/20/2010. Phone: 408-765-8080. Tracking Nos: 7010 1870 0002 0193 0360 and 7010 1870 0002 0193 0377. (Filed in this Case 5:22-cv-03828-NC, at Dkt. 1-7; filed 06/28/22 and Dkt. 21; filed 09/27/22)

Intel was aware that the "*use*" of Plaintiff's patented CMDC devices i.e., new, improved upon, and useful, desktop PCs, laptops, tablets, cell phones, etc., without license or authorization from Plaintiff, to generate hundreds of billions of dollars in revenue, is in violation of 35 U.S. Code § 271(a):

"Except as otherwise provided in this title, whoever without authority makes, *uses*, offers to sell, or sells any patented invention, within the United

States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."

Intel was aware that the "*offer to sell, or sell*" of Plaintiff's patented central processing units (CPUs), without license or authorization from Plaintiff, to generate hundreds of billions in revenue, is in violation of 35 U.S. Code § 271(a):

"Except as otherwise provided in this title, whoever without authority makes, *uses*, *offers to sell, or sells* any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."

Intel was aware that whoever offers to sell, or sells "*an apparatus [i.e., central processing unit (CPU)] for use in practicing Plaintiff's patented process, constituting a material part of Plaintiff's invention*", without license or authorization from the Plaintiff, to generate hundreds of billions of dollars in revenue, is in violation of 35 U.S. Code § 271(c):

"Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, *knowing the same to be especially made or especially adapted for use in an infringement of such patent*, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."

Sincerely,

Date: <u>12/17/2022</u>

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 17th day of December, 2022, a true and correct copy of the foregoing "Informal Brief of Appellant", was served upon the following Defendant by priority "express" mail:

Richard Tyler Atkinson

McManis Faulkner

50 West San Fernando Street, 10th Floor

San Jose, CA 95113

Phone: (408) 279-8700

Fax: (408) 279-3244

Email: tatkinson@mcmanislaw.com

_Larry Golden_

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

U.S. POSTAGE PAID
PME 1-Day
GREENWOOD, SC
29649
DEC 19, 22
AMOUNT

**$38.20**

R2304W120119-11

DC 07    20439

UNITED STATES POSTAL SERVICE ®

FOR PICKUP OR TRACKING

EI 393 143 648 US

**UNITED STATES POSTAL SERVICE** ® | **PRIORITY MAIL EXPRESS** ®

**CUSTOMER USE ONLY**

**FROM:** (PLEASE PRINT)    PHONE 864 288-5605

LARRY GOLDEN
740 WOODRUFF RD.
#1102
GREENVILLE, SC 29607

**DELIVERY OPTIONS (Customer Use Only)**

☒ SIGNATURE REQUIRED *Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.*

**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
    *Refer to USPS.com® or local Post Office™ for availability.

**TO:** (PLEASE PRINT)    PHONE 202 275-8000

U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT
CAFC CASE No: 23-1257
717 MADISON PLACE, NW
WASHINGTON, DC

ZIP + 4® (U.S. ADDRESSES ONLY)

2 0 4 3 9 -

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

▶ **PEEL FROM THIS CORNER**





**PAYMENT BY ACCOUNT (if applicable)**
USPS® Corporate Acct. No.    Federal Agency Acct. No. or Postal Service™ Acct. No.

**ORIGIN (POSTAL SERVICE USE ONLY)**

☒ 1-Day    ☐ 2-Day    ☐ Military    ☐ DPO

PO ZIP Code    Scheduled Delivery Date (MM/DD/YY)    Postage
29649    12/20/22    $ 38.20

Date Accepted (MM/DD/YY)    Scheduled Delivery Time    Insurance Fee    COD Fee
12/19/22    12:00 PM    $    $

Time Accepted  ☐ AM  ☐ PM    Return Receipt Fee    Live Animal Transportation Fee
2:57    $    $

Special Handling/Fragile    Sunday/Holiday Premium Fee    Total Postage & Fees
$    $

Weight    Flat Rate    Acceptance Employee Initials
1 lbs.  11 ozs.    $ 38.20

**DELIVERY (POSTAL SERVICE USE ONLY)**
Delivery Attempt (MM/DD/YY)  Time  ☐ AM ☐ PM    Employee Signature

Delivery Attempt (MM/DD/YY)  Time  ☐ AM ☐ PM    Employee Signature

LABEL 11-B, MAY 2021    PSN 7690-02-000-9996

office, at an Express Mail with your Express Mail package at a post